Good morning, Your Honors. Cindy Bonuco on behalf of the appellant, Denise Steffens, and with me at council table is my co-counsel, Dan Stormer. I'd like to reserve four minutes for rebuttal. And the only issue that I'm going to address today in oral argument is the lower court's finding that all of the evidence submitted by Ms. Steffens was, quote, not showing in the least that the reasons Regis gave for her termination were pretextual, unquote. Now this court held in the Twain case that a plaintiff in an employment action needs to produce very little evidence in order to defeat an employer's motion for summary judgment. In this case, it's important to recognize that the district court actually found that the plaintiff, Ms. Steffens, made out a prima facie case that she was complaining about wage and hour violations at the place of her employment and that there was adverse employment actions that were taken against her after the October 2006 meeting during which she complained. Now here, there are numerous, in fact, at least ten genuine issues of material fact which the district court disregarded when it granted summary judgment and that showed that the unlawful activity that she complained about was possibly, in part, one of the reasons that she was terminated and that the reasons that were given for her termination were pretextual. The contested issues of material fact include the following. First, timing is critical. The decision to terminate Ms. Steffens was actually made within minutes of her complaints about wage and hour violations after that October 2006 meeting. Second, in December of plan, an aggressive PIP which her supervisor, Mr. Jones, admitted that its sole purpose of that PIP was to create a reason for Ms. Steffens to be terminated. And Mr. Jones, her supervisor, admitted that there was never an intent to keep Ms. Steffens following the execution of that PIP. Third, her wage and hour violations and because she was more open and more up front and more confrontational in her complaints than anyone else in that area. Fourth, the regional vice president ordered her supervisor, Jones, to find and hire Ms. Steffens' replacement before she was even placed on the PIP or before she even knew that her performance was an issue that her supervisors had. Fifth, the timing of the issuance of the PIP is also shows the pretextual nature of the PIP and these are issues that the jury should consider. In fact, she received a performance-based bonus just one month before she was placed on a PIP in and the HR director all admitted that the PIP had unattainable goals. Those were the words used by all three of the Regis executives. And what's more, the PIP demanded that the required results be met by April 30, 2011 and that was just 19 days after she was issued this performance improvement plan. Sixth, the general manager of that area, Mr. Jones, also opposed placing Ms. Steffens on a performance improvement plan and he also thought that she was the best general manager for that area and he was also opposed to her termination. Eighth, Ms. Steffens also met her budget profitability goals in the first quarter of 2007 and she did. Ninth, the regional vice president and the decision maker praised Ms. Steffens in June of 2007 on a conference call before her colleagues for the performance of her center. And tenth, a serious dispute also remains as to who the decision maker was. Mr. Goldbart, the regional vice president, when he was asked in deposition point blank, did you make the decision to terminate her, says no. But the district court found that Mr. Goldbart, the regional vice president, was in fact the person who made the decision to fire her and that he had legitimate reasons for terminating her, while Mr. Jones, his immediate supervisor, testifies that it was the regional vice president who made the decision to terminate him. So there's a serious dispute as to who made the decision and what the motivations were. And finally, your honors, I'd just like to point out that the district court erred when it failed to consider all of this evidence cumulatively, which shows that there are genuine issues for the jury to decide in this case as to whether Ms. Steffens was terminated in retaliation for her complaints about wage and hour violations. Counsel, employers can't fire people for no reason at all unless there's some public policy or other reason that would preclude that. Would you address that? Well, as long as the reason for the termination is not illegal, there's no dispute here that Ms. Steffens was an at-will employee. She could have been fired for no reason at all. Well, now, so you should address the illegality, then. The illegality here is that her complaints about wage and hour violations, she complained about a public policy, which is that employees at her company were not being paid for meal breaks, rest breaks, or they weren't being provided those meal and rest breaks, and they were having overtime shaved from their work hours. And it is a violation of public policy to terminate someone in retaliation for raising those complaints. And that's recognized by Tammany, the wrongful termination in violation of public policy, and by a case called Goldby, Maryland. Counsel, of the evidence that you've cited us, what portions of that do you think are direct evidence as opposed to indirect evidence? The direct evidence that there's retaliation is the admission of her immediate supervisor, Shannon Jones, who testified that he believed she was fired because she complained about wage and hour violations. And if you would like a cite to the record, I can provide that for you. That's that excerpt of record 824. He says she was placed on a PIP because, quote, she was more open and she was more upfront about those issues than anyone else in the area, and more open and more confrontational about those topics. Her immediate supervisor admitted that. She wasn't complaining that she wasn't properly compensated for wage and hour. She was complaining about other employees. Yes, Your Honor. She was a supervisor at a center, and her employees that she supervised, who did the daily tasks and worked the eight-hour shifts, were not. She was complaining that they are understaffed. She was almost like a whistleblower saying you're not following California wage and hour law. She's a whistleblower. Yes, Your Honor. If the Court has no further questions, I reserve the remainder of my time for rebuttal. Thank you. May it please the Court, Dave Carruthers for Regis Management Group. The district court's ruling and order should be affirmed. Judge Byrne's decision went to, in fact, it was a quite candid ruling that he had ordered in this case, and it's quite clear there was some burden on trying to find evidence, direct evidence, that would support a response to Regis's legitimate business reasons for the termination. Judge Byrne's concluded that based on the record, there was simply no direct evidence that pointed to Regis's decision being illegitimate. Going then to whether or not there was circumstantial evidence, the district court simply determined that everything in response to that was speculation, speculation that could have gone either way and in either direction. Point in fact, the October 2006 meeting, as the record shows, was the first time Sandy Goldgard had even met Ms. Stephens. It was their first meeting. And this is right after his company had taken over the company? It was right after he had become the regional vice president. And this was sort of his meeting the center directors tour to meet all the folks at Ms. Stephens' level. And at this initial meeting, and just so the record is clear, this wasn't a meeting where the only thing discussed was Ms. Stephens' concern about employees not getting meal and rest breaks. The meeting was discussing a number of things, out of which Ms. Stephens raised this issue that, you know, I'm understaffed and I can't get folks their meal and rest breaks. And so it was in that context that this came up. But out of all of those issues, there was never any focus by anyone and by Ms. Stephens' own admission in her deposition, which is cited in Judge Byrne's ruling, that he even focused on that and that that was even a concern for him. I'd like to address the issue raised by one of the questions from the court in which counsel attempted to address, but Mr. Jones, his own admission was that after that October meeting, not once did Mr. Gogart indicate, express, imply, hint, wink that there was ever an issue about the October 6th meeting concerning any discussion about meal and rest breaks. Counsel, what is the evidence that he directed that she be immediately put on to one of these improvement plans? Well, there were two meetings. The first meeting, the get-to-know-each-other meeting in October 2006, and I believe the record shows that Mr. Jones, in terms of his questions to her about what were her plans on improving the business operations at the center, at Ibram Plaza. There was a follow-up meeting in December of 2006, where Mr. Gogart expected that given the somewhat deflated meeting in October 2006, that Ms. Stephens would be better prepared for the December 2006 meeting. And therefore, when she wasn't, he had reached the conclusion that he didn't think she was suited for the position, that she was enthused about the position, and he wanted to go forward with it, and therefore decided she should be put on a PIP. And that's what led to the PIP in the first quarter of the next year. Did I address the Court's question? Well, you answered it as you would. Again, just pointing to Judge Burns's ruling, is that in his search for trying to find, in light of there being an absence of direct evidence, looking at any circumstantial evidence, and simply not finding the evidence, he was unable to find the evidence that there was any particular or substantial evidence, specific or substantial evidence, to support a comeback from the employer's legitimate reason for terminating Ms. Stephens. And again, it was simply speculation offered by Ms. Stephens as to why the Court decided to terminate Ms. Stephens. It's not entirely speculation, unless you deem Jones' statements to be speculation. Because Jones actually says she was more vocal about this than anybody else, and that's why Golgar was after her. Well, and I do, Your Honor, with all due respect, that is speculation. It's just Mr. Jones' speculation about what he thought was going on. Right, but he's the third person who's present at these meetings, and he's her immediate supervisor, thought she was doing a good job. So he didn't see the problem that Golgar saw. And he did see a problem that she's complaining of, which was that Golgar had a reaction to her complaining about the wage and hour situation. Well, I don't think the record supports that. Again, at that meeting, there were a number of issues discussed about the center operations. And so Mr. Golgar was, in his testimony, he said he was unhappy about her responses to his questions about what was her plan to turn this center around. And that's what he articulated, and that's what he stated. If we had mixed motives, if Mr. Golgar, in his heart of hearts, said, I need to get rid of this employee because she's going to be a pain in the neck over this wage and hour stuff, she's a whiner, I'm not going to call her a whistleblower, she's a whiner. And I don't think she's doing a particularly good job. Now, if you had sort of a dual motive, doesn't this go to a jury? If there was evidence of both of those motives, that's correct, Your Honor, that it would be a mixed motive case. The problem is, and this is what the district court was confronted with, there was, on this record, a total absence of any nefarious motive with regards to whistleblowing or complaining about the wage and hour situation. At least, Mr. Golgar's reaction to that. Finish your answer. The only thing we have is Mr. Jones, who at the same time says, I never had a conversation with Mr. Golgar about his feelings in response to that particular subject. He never hinted to me about his response to that particular subject. So his surmise about that is simply that, it's just speculation. But even, but counsel, this is what bothers me. Okay, the district court did find a prima facie case, and it said, there is sufficient evidence that Stephens told Golgar during their October 2006 meeting that she believed Regis' policy of not providing meal and rest breaks to hourly employees was unlawful. And then you have her testimony that says that in that very meeting, she said, I knew it was California law, we have to do this. And after I said there were many days, we weren't giving the rest breaks, the lunch breaks, it was a violation of California law. So, and Jones says she reported what she felt was happening was not right and was illegal.  And then, immediately after that meeting, Golgar tells them to start looking for a replacement for her because she's a problem. Now, these are findings that the district court seems to be making. Now, you're giving me, you're providing us with alternative inferences that can be drawn from these findings, but it does seem to me that the district court may be incorporating some of these findings. And I don't know that the district court has directly made the finding of no pretext when it really should have gone to the jury, or the jury to find it. Well, I believe that what Judge Burns did was make findings with regards to, number one, there were a number of issues, most of which were business related, discussed at that meeting. And to say that his response was simply to that one particular issue that's the subject of this litigation is simply not correct. It's speculation. That's what the judge stated in his ruling, that that's speculation. To say that that's what he came away with, given all the other topics that were discussed at the meeting. Counsel, you made a statement that they wanted to know how they could turn the center around. Well, there's evidence that this was the best-performing center, and she had received a bonus a month previous to that. Because of her sterling performance, there's nothing speculative about any of that. But it does raise some inferences that all we have to find here is that there was a material dispute of fact. And if that's the case, then it has to go to the jury. The district court, in looking at that issue, stated that the, the, the, the, the fact that it was the best-performing center, positive performance of the center was Ms. Steffens' own opinion about her performance. And the district court stated that I need more than her own self-assessment. She has to point out something more. Well, counsel, there was evidence about the profit from that center as compared to others. The, the evidence on that is that Mr. Golgart testified, and it's in his declaration as part of the record, the Excel spreadsheet, that the center was not performing well, and that his assessment at some point in time was incorrect. I think it's paragraph five of his declaration where he says, when I had them pull the Excel sheet and I looked at those numbers, and the, the, I think he refers to some sort of statement at Regence that if you just live by the averages, you die by the averages, that he looked behind the numbers and found out that the center itself was not really performing well. In fact, in relation to other centers, it was actually in the negative or, or slightly above the negative. So that's, that's the evidence in the case, and that's what the district court looked at. Well, there could be a material dispute there as to what the performance actually was. Well, I believe why the district court did not believe there was a material dispute is because the only thing contra to that was this self-assessment by Ms. Steffens, and the district court felt that I need more than the plaintiff's own self-assessment about her performance. I need evidence, something more objective to show what the performance was. Now, that was presented in the declaration of Mr. Goldgart, and that's what the court looked at in, in making its ruling, and deciding that that self-assessment by Ms. Steffens didn't carry the day on how the center was performing. Is it accurate that the company was violating public policy? It's not accurate, and again, that was not a part of the case, at least in terms of as we went forward. Well, it may not be, but it seems that if, in fact, they were not allowing any breaks or lunch breaks, they were violating public policy. Isn't that accurate? There was no evidence or substantial discovery on that issue in this case, and so that can be taken back. Ms. Steffens didn't see it as a major point of her discovery in the case, but there's no evidence that Regis was violating any labor laws, and there's no conclusion that it did. In fact, this position was that it did not. Well, did they or did they not give these breaks? They did give breaks. They did give rest breaks. They actually, part of the evidence in the case was that actually what Regis did was train managers on how to comply with the California Labor Code with regards to meal and rest breaks. And in response to any issue that ever came up, so this training. Well, that would be largely irrelevant to what her point was, which was I've got so few employees here and we are so busy that my employees don't have time to take the rest breaks that they're entitled to as a matter of law. And so whether they've been, obviously she's had some training. She thought they were in violation of the law because they were so busy. She was complaining, she was complaining about the, the complaint about the wage and hour breaks. It was a way of saying, I've been understaffed here. And Mr. Golgar's response to that was, have you made sure you have the right people in place? So is it a performance issue? Because it appears that all the other managers at their respective centers are not having this issue. So do we need to look at whether or not you have the right people in place to do this? And so that's the kind of issue I think California employers face every day in making sure that the people are being properly managed and that the person who's doing the managing is making sure that they have the right people in place to make sure that people are being covered. That's managing. And that's what the training was aimed at. And quite frankly, anybody can say I'm understaffed or I'm not, people can't get breaks. Doesn't mean that the employer is violating the law necessarily. It just means whether or not people are being properly managed. And that's how Mr. Golgar responded to that issue. Do you have the right people? And so it wasn't an issue of it being basically brushed under the rug or hidden from. It was again in the context of how are you running this center? What's your plan for making sure it operates in a way that's positive and going forward basis? Thank you. All right. Thank you, counsel. Your honors, the very argument about what the facts were demonstrates why this case should go to a jury and why a fact finder should determine what exactly took place and what the motivations were behind Ms. Stephan's termination. And I'd like just to address a few points that the court raised to counsel. One was regarding the direct evidence that was submitted before the district court. And even if this court finds that the evidence that we submit was direct evidence, that her supervisor testified she was put on a PIP because she complained about wage and hour violations, even if this court finds it's not direct evidence of pretext under the Chuang case, the Berzine case we've cited, and Godwin v. Hunt, it's enough that it becomes circumstantial evidence of judgment. The other thing that the court raised was that the fact that perhaps one of the reasons she was terminated was because she complained about wage and hour violations. And in addition to that, perhaps there were concerns about her performance. As long as an illegal reason, her complaints, was a motivating factor for her termination, that's enough and this issue should go to a jury. And there's a genuine dispute as to whether or not the complaints were motivated or not. And also, you raised questions about the performance of the center. And there is a material dispute as to what exactly were the metrics and what was the profitability of that center at the time. And in June of 2007, opposing counsel said that there was just nothing more than a self-assessment by Ms. Steffens that her center was performing well. Well, in fact, there's more than just her self-assessment that there was profitability at the center. There was a performance-based bonus, which she received just one month before she was placed on the panel. Do we have anything in the record that tells us what her performance-based bonus was compared with the performance-based bonuses of other managers? No, Your Honor, that's not in the record. Just testimony. We don't know whether she got a $500 savings bond and everybody else got $10,000 in cash or whether she got more than everybody else? No, Your Honor, it's just a testimony in her declaration that she received a check and then the testimony of her immediate supervisor, Mr. Jones, which said that she earned a performance-based bonus for meeting her budget goals. And the other additional, more than just her self-assessment evidence that's in the record is that her immediate supervisor gave her a 2006 performance review right before her complaints, saying that she was an exemplary employee, an exemplary manager. And then in June of 2007, the regional vice president put together a PowerPoint slide that showed that the performance of the Emerald Center, which she managed, was ranked in the top three for increasing profitability by 22% in the first quarter of June of 2007, from January to March of 2007. The district court disregarded all of that evidence. And finally, the last point I wanted to address that the court raised was whether there were actually violations of public policy occurring at Regis. And there is evidence in the record. In the declarations of Linda Reed, Nancy Farley, the supervisor Jones, Ms. Steffens, they all testify that there were issues, that managers had to shave the hours off of employees' timesheets when they couldn't provide meal and rest breaks because they were so understaffed. And even if this court finds that, you know, perhaps that raises issues as to whether there were public policy violations. But even if this court finds that there's not enough evidence to show that there were actually violations taking place, under the Green v. Raley case, which we've cited in our briefs, all that is necessary is that Ms. Steffens have a reasonable belief that public policy violations were taking place, that wage and hour violations were occurring, in order for her claim to proceed. So in light of all of this evidence, which the district court disregarded, the court should reverse and remand this case so that a jury can try Ms. Steffens' claim for wrongful termination in violation of public policy.
judges: Fletcher, Wardlaw, Bybee